Yes, sir. Your Honor, this case on the docket 2-16-0252, people of the state of Illinois, defendant's appellee, Ms. Harris-Franklin, defendant's appellant, on behalf of the defendant's appellant, Ms. Phyllis J. Perkin, on behalf of the defendant's appellee, Ms. Cora Miller. Thank you. Ms. Perkin, on behalf of the defendant's appellant, you may proceed. Good morning, Your Honors. May it please the Court. I appeal this morning, I'm representing Paris Brandon, who is appealing his conviction for resisting a police officer. The fundamental fact of my client's disobedience of an order issued by a peace officer is not in question in this case. But the legal issue presented is whether or not the order that was issued was an authorized act of the peace officer in question. The statute that defines the offense of interfering with a peace officer requires that the resistance have been to an authorized act. Now, a terri-stop could be, I should say, a valet-terri-stop could become the basis for resisting charge, correct? Yes. If it's a valet-terri-stop. Yes, a valet-terri-stop could be, if resisted, could be the basis for a charge, but it's our position in this case that there was no valet-terri-stop. Could one argue, though, that it initially, it maybe wasn't, but once the defendant consented to pat down the search, that it turned into a terri-stop? I think that it's possible to conclude, as a legal matter, that the detention did not occur at the very moment when my client was confronted by police. But whether the conclusion is that the detention happened at the moment that he was confronted by police, or whether the detention, as a legal matter, occurred at some time down the road of the confrontation, is not material to our argument because it's clear that he was being detained by the time the order was issued to him. And just briefly, of course, these facts were that the police had received an anonymous tip that was aired on the police radio, and pursuant to that tip, they went to the area, and actually right in front of Mr. Brandon's residence, and confronted him there. Where was the defendant when they arrived? You know, I reread my description of the testimony shortly before, and it's a little bit unclear. At one point in the testimony, it indicates that he was by the stoop or on the stoop. At another point, it indicates that he was in the driveway. So I think there is no question but that he was in close proximity to the entrance of the house. I mean, certainly the later testimony that involves him running into it. Was he ever in the car? Did police officers ever see him in the car? That is also, to me, not completely clear. I believe that I understand the testimony of one of the officers to be that they viewed the car coming into the driveway, and that they viewed more than one black male exiting from the vehicle. But I am not completely certain that they actually saw him, Mr. Brandon, exit the vehicle. I don't believe that the proof is clear on it. Because he basically admitted that he was there. And he came from the area that he was in. Correct. So as the confrontation proceeded, my client did acknowledge that he had been in this apartment complex. And the anonymous information that had been provided to the police and was aired on the police radio, is that there had been, let's say generically, a shooting at this apartment complex. Now, the trial court in its findings, and the findings are in the appendix to the record, but the trial court in his findings himself, the trial judge, acknowledged that the evidence was rather unclear on a couple of points. And one of the points on which it was unclear was the exact nature of the conduct or occurrence at the apartment complex. So that the judge in the findings notes that at one point it says there was a shooting, and that at another point it says, on cross-examination of one of the officers, that no, it wasn't a shooting, it was only a weapon displayed. So the record in more than one respect of the state's evidence is not completely clear. Is that relevant, Ms. Perko? Well, it's relevant in the following sense. The information that is known to the police is obviously a crucial question in the Terry analysis. And it is particularly significant that primarily the information known to the police in this case was of an anonymous nature. And when the police are acting on the basis of anonymous information, it is necessary that the reliability of that evidence or of that information exists, so that the indicia of reliability is dual. There has to be an indicia of reliability, first of all, that the caller knows that criminal conduct occurred. And therefore, in answer to your question, Justice Shastok, the fact that the evidence is unclear as to whether a weapon was actually shot or not shot is relevant to this question of whether there was criminality. At one point in my analysis in my brief, for instance, I point out that the mere discharge of a weapon is not necessarily criminal conduct. So there is a question in this record and an unanswered question of whether or not the police actually were aware that criminal conduct had occurred. In other words, whether or not they had information based on the anonymous source that there indeed was criminal conduct. Is that necessary for Terry's law? Well, they have to know, as I recall the way it's stated in the law, they have to have a reasonable suspicion. A reasonable, articulable suspicion. Either that criminal conduct occurred or that the detainee is committing it at that moment or that it is likely to occur. So, yes, the nature of the conduct, I mean, assuming everything else is equal, meaning that there is reasonable suspicion, sufficient specific articulable facts to raise a reasonable suspicion, to support a reasonable suspicion, that reasonable suspicion must include the commission of a criminal act. And it presumably could be that the police had more information. But what we have is what the record shows. Sometimes when there's a series of interactions, I think it's important to break it down. There was a call, anonymous call. There was a description, either it was a shot fired or a weapon display, and the caller described a small green vehicle leaving the scene, correct? Correct. The officer then, because he knew the defendant apparently had a similar vehicle and had a gun, on a hunch went to the defendant's house. At that point, it would seem there wasn't enough to make it a terrorist act, correct? Correct. So, but as we also know, the police, as I recall, can approach somebody in a public place and talk to them, not needing grounds for a terrorist act, and we agree on that. We agree on that. He doesn't have to talk to him, and an officer can walk up to anybody. We agree. And the public can ask them questions. No question about that. So even assuming it wasn't a basis for a legitimate terrorist act at the point the officers first approached the defendant, nevertheless, they approached him, and as I read the record, he engaged in some conversation with them voluntarily and admitted he had come from the area of the shooting or the weapon. Whatever this was, he had come from those part of the conflict, correct? That's correct. Okay. All right. So now we don't have, we're still sort of in another world between, you know, a potential encounter and a terrorist act, but then when he starts acting evasive, giving inconsistent answers, and tries to go into the house, why doesn't that become the basis for a terrorist act? Well, I'm not sure about the evasiveness issue, but assuming for a moment that he was evasive in any way, the SHIP decision on which we place considerable reliance, as well as other cases on which, that SHIP discusses and on which it relies, will indicate that evasiveness, nervousness, furtiveness, and related type of conduct that occurs after a confrontation or as the detention develops is different than furtiveness, nervousness, or that type of conduct that occurs before the defendant engages in a confrontation. So can't we distinguish this case from SHIP? Because SHIP is a little different. They got a call of a fight, and then when they come up in a woman walking a block from the fight, but when they come upon this woman, I think she might have been with somebody else, there was no sweat, no agitation, wasn't out of breath, no disheveled clothes, no indication that she was actually the individual they were looking for, and then somebody whips, has hands in the pocket, and they say, get your hands out of your pocket, get your hands out of your pocket. So they have no reasonable suspicion to even determine that that is the person in the fight, whereas here we have every indication that Mr. Brandon was at the place because he admitted that he was, right? Well, he admitted that he was in the complex. Correct. So it doesn't reflect the size of the complex, but the area is referred to as a complex. Right. And all that Officer Moore knew was that there was a shot. That's all he knew, that shots were fired. Correct. That's all he knew. That's all he knew, so that's all he can rely on. So whether it's shots or a pistol, he's relying on what he knew. Correct. But, I mean, so isn't, I'm just trying to distinguish Schiff, which I know a little bit about that case, Schiff versus this case. I just think we're talking about two different cases.  Well, I mean, with reference to an idea of verdantness or unusual behavior by Mr. Brandon, in fact, and it's quoted in my brief, and I don't recall, however, whether it's Ellis or whether it's Moore, I don't quite remember which of the two officers it was, but that officer specifically stated that there was no suspicious conduct exhibited by Mr. Brandon at the time he was confronted by the police. And if it's necessary, I could find that point in my brief. Let me just interject this, because I don't think we've hit on yet what to me is the critical distinguishing factor between Schiff and this case. According to Schiff, the Court specifically noted that the defendant was not attempting to leave the scene. That's the critical difference here. In Schiff, there was no evasiveness. The defendant was there. Here he's trying to flee and get into the house. Isn't that a major distinguishing factor? No. At the time he, at the time Mr. Brandon, no, I don't see a distinction or a difference in Mr. Trying to get away from the police? Doesn't matter? That's exactly what Schiff was trying to do. I mean, after engaging with the police, Schiff likewise, they tried, as I recall, some of the facts in Schiff, the officers had put their hands on his clothing, and he ran away from them. Likewise, I mean, that's quite similar to what was going on at the time the officers in this case told Mr. Brandon that he could not leave the premises. They told him, excuse me, could not go into the premises and leave the outside. I mean, they told him that twice, and the testimony is that in the course of telling him that, they also attempted to grab his clothing. So actually, I would submit to the court respectfully that the circumstances of the two cases are highly analogous. Thank you. Okay. Thank you. Okay. Counsel, you may proceed. May I please the court? Good morning, Your Honors. Counsel, my name is Cora Moy on behalf of the people. The issue before this court today is whether there was sufficient evidence to prove defendant guilty of resisting a peace officer. And the state needed to show that defendant knowingly resisted the performance of an authorized act within the officer's official capacity. Implicit in defendant's position is that in addition to the offense elements is that he wants this court to find that the state was also required to prove the legality of the authorized act. And that argument suggests that any unlawful act cannot be the basis of a resisting charge, which is contrary to existing law. And here, we do have an authorized act in that Austin Moore was responding to shots fired and or showing the gun, but his knowledge was that there were shots fired. So that is why he was at the defendant's home is investigating this claim. And that is an authorized act. Well, there would be an authorized act. But I think your point is, certainly the police go there. They have the right to follow up and talk to the defendant. At the point where they arrive at the defendant's residence, aren't they basically acting on a hunch? No. Right? It was a card. Nobody physically described him. Are you saying they had a suspicion that it was, in fact, him before they even talked? No. I'm sorry. That's not what I intended to say. When the officer initially approached the defendant, that was a consensual encounter. Right. It was not a Terry stop. It was not a Terry stop at that point. Correct. The Terry stop did not begin. I think it's a culmination of events that leads to the Terry stop. Well, what were those events specifically? What turned this, as you have alluded to, a consensual encounter into a legitimate Terry stop? I think the very first event that moves it from consensual to Terry is when the officer asked the defendant, where were you tonight or where did you come from tonight? And unsolicited, the defendant said, I came from Eastwood Apartments, which from the tip that was given through dispatch is where the shots occurred. And the car description was green, and this was a green car that he pulled up in with his friend. We don't know who's driving, do we? Or do we know? I don't believe the record is completely clear about who's driving.  I thought Ellis did say in his testimony that he saw the defendant get out of the driver's side, but I could not find that in my notes. So he places himself at the scene by making the admission he just came from the scene. He came from the scene. It was there, in fact. Correct. And the officer notes he has a green car and there's a green car there. So then what happens? And this is also combined with the prior knowledge that Ellis had in that he knew the defendant owned a green car and the handgun and then went directly to the driveway and very shortly after saw the defendant circle the block and drive into his house. And this was very close in time to when that dispatch call was given. And from whatever Ellis knows, that has been like more, I believe Ellis says that he put that information out over the radio. So after the defendant tells Moore that I have been in this area where the shots have occurred, the… That becomes a terrorist stop. It begins, right, but it's also a continuous act because even after these two departments, the defendant was initially calm, but then when Officer Moore says, I have a witness who may want to… Right. …who comes to identify you, the defendant was initially calm and then began becoming more nervous. And agitated. And agitated. So if we're at a terrorist stop here, can one be found to be resisting during a terrorist stop? The answer is obviously yes. Yes. And it's already been acknowledged in the case law. Ms. Perko has been very candid. The attorney that she is with the court acknowledged. A voluntary stop can be the basis for resistance. Yes. So the question is… I'll be sure to ask you the questions next time. Thank you. All right, you two. Yeah. She already conceded that. The question is, so at the time he's attempting to leave, you're alluding to that he got nervous and tried to go in the house. So there had to be a voluntary stop at that point, correct? Correct. And the safe position is that the terrorist stop initially began through each of the departments, but there's no… It did not end. That reasonable position, those facts did not end. And I think with more and more of Officer Moore's exchange with the defendant, that there were more facts to support this, the Terry. So more facts have to happen before he leaves because he's under no obligation to talk to the police. Correct. Again, it can only be a valid terrorist stop if you have a reasonable, articulate suspicion. He's not out there to cooperate and he leaves at that point. But the one question I wanted to ask you, and I read Schiff a little differently than Ms. Perko candidly, I thought in Schiff one of the major distinguishing factors is the defendant didn't try to leave the scene at Schiff. And here he was trying to leave and get into his house, right? Correct. How did you read Schiff? She says Schiff is sort of analogous in controlling here. What's the difference between this case and Schiff? I believe what your honors have all hidden on the head is that we have an invasive behavior here. The defendant is fleeing. He suddenly fled, even though the officer is in the middle of investigating the claims. The defendant first says, you know, I left my keys in the car. I'm consenting to you searching my car, but even though I just got out of this car, my keys are somehow now in the house where I didn't leave the driveway. I think that's invasive. I think the fact that after the officer talks to the defendant again and says, I need you to stay in the driveway, that the defendant then says, well, I have a phone call. He starts backing away. I think these are factors that the officer, that any specific and attributable facts that were known to the officer at the time would lead a person of reasonable caution to believe that you had to investigate. Let me ask you a question. Even before we get there, Ms. Perko brought up that if you're using an anonymous tip, doesn't it have to be reliable? It does, but this case isn't about an anonymous tip. This wasn't, the officer didn't go there to investigate necessarily the anonymous tip. What the officer went there for is just to investigate. He was responding to the shots fired, and that was the descriptor that was given. And based on police work, they arrived here, and that's why that first encounter is a consensual encounter and not a Terry stop, because an officer can go to an individual to ask questions. So he wasn't, he was, and I think he testified that he was acting on a hunch. Yes, but that does not, while he was on a hunch, that does not necessarily mean that he was, that a Terry stop initiated at the time that the officer went to a defense home. And again, in this case, the tip, it's a small green car with black males, and as I've indicated, the Terry stop didn't really, I don't think it really began until the defendant said, But regardless, that was, the investigation of these claims was an authorized act, and therefore the state proved that element beyond a reasonable doubt, because he was there to investigate the claims. Okay, your point in any event, as my understanding is, even if he went there initially without having a legitimate case for a Terry stop, he could certainly do that because it was a report of a crime. He doesn't need probable cause or even articulable suspicion to walk up to somebody in a public place. That is correct. At some point, and this is where you and Ms. Purkle disagree, was whether or not there was enough for a Terry stop when he decided to go into his house. And that may be the ultimate issue. We'll call the time to decide. Thank you, and the state would ask that you reaffirm the claims. Thank you. Thank you. Ms. Purkle. Just very briefly, Your Honors, I have a quick moment to look at the SHIP opinion, and I'll just direct Your Honors' attention to paragraph 33 of that opinion, where it says, The last night the officer testified that he told the defendant that he was not free to leave. He also testified that he stopped the defendant from walking away. But the difference between SHIP and this case is that SHIP, it turned out, the officers didn't even have reasonable articulable suspicion to stop them because there were supposed to have been a fight. They weren't disheveled. They weren't sweating. They just happened to be within some walking distance, like a block from the fight. So doesn't that make that case different? They weren't out of breath. They weren't disheveled. Their clothes weren't disheveled. That's, I think, what distinguishes SHIP from this case. This case didn't even have reasonable articulable suspicion because he got a call that somebody in this green car shots fired, and he went to him. It's a little different, isn't it? Well, I don't think that it is. I mean, it gets there once he admits that he was at that apartment complex. Well, with reference to this admission of my client, the admission is simply that he had been in the apartment complex. So in order to connect him with anything of a criminal nature that occurred in that apartment complex, you have to establish that there was some sort of reliable information that a green car or the people in a green car were connected to criminality. Well, they were in the process of doing that, right, when they went to ask for a lineup? Well, they may well have been, but the issue on the field here is not whether or not they could have developed further information, even while my client was inside the house, and whether they could have gotten a probable cause warrant at that point. I mean, that is not the question. The question is whether at the time they detained him, had they connected this green car, and more specifically, the people inside the green car. I mean, what they have really is a green color and a black color. They don't need probable cause at that point, though. No, certainly they do not need probable cause, but they need a specific articulable fact that connects the black male and the green car, who happened to be Paris Brandon and presumably his vehicle, with a green vehicle and black males in the apartment complex. And there simply is not an articulable fact that connects those. You look for something more specific about that car, like it had a yellow stripe, or it had something where you can say that green car and this green car are the same. Sure, like the mere fact that the black man would have been wearing a gray or black hoodie or whatever. What about the time and distance? Isn't that a factor? Well, we don't know how big this apartment complex is, but by reason of the fact that it's a complex, I'm going to assume that it's more than just a block long. But we don't know. They could have put that in the proof. I mean, it may be that the complex is so small that it's only one block long. But on the other hand, it could be acres. Well, can't we take some of those inferences from the facts here? That Ellis hears the call, he puts two and two together, and is at Ellis' driveway apparently before Ellis gets back. I'm sorry, before the defendant gets back driving the car. Well, we don't. I mean, the thing that's missing is that how do we know that it was this black male in this green car? We don't know at that point. Well, I think that we have to know that first, I mean, what's being overlooked here, and actually it's not discussed at all in the state's brief, is that at that point the police are operating on the basis of anonymous information. And anonymous information cannot be relied upon unless it has the indicia of trustworthiness. And there are no such indicia in this case. We know nothing about the informant. Did he hear shots or she? Did that person see a pistol? Is that person a common citizen? I mean, we know nothing about the informant. We know nothing about how the informant acquired this alleged knowledge. So, I mean, that is an aspect of this case that actually is discussed in SHIP and the cases on which it relies that has to do with the right of the police to rely on this information. And if the information is unreliable or, more particularly, that it does not exhibit indicia of reliability, then it cannot be relied on and it cannot form the basis for a legitimate Terry stop. And that's an aspect, I think, to that. Your position is that the Terry stop must rise and fall on that. And we can consider, cannot, excuse me, consider the context. Well, I think the only additional context we have is my client's admission that he was in the area. But his evasive conduct afterwards, can't we consider that? No. The SHIP is saying that the SHIP and other precedents that it discusses says that there is a distinct. We can't get there. Right. We can't get there. There's a distinct difference between, let's say, evasive conduct that occurs before the would-be detainee exchanges with the police. So, you know, if the police are approaching somebody and that person immediately flees, yes, that is considered for the basis of a Terry stop. If this agitation develops in the course of the confrontation, no, you may not consider it. So, and in this case, it happened well, if it happened at all, it happened well into the confrontation and after the detention had been effected. So for the reasons that I've given this morning and all the reasons in my brief, we respectfully request that this Court reverse the conviction of Paris Brandon for resisting a peace officer. Thank you, Ms. Brandon. I would like to thank both counsel for the follow-up arguments here this morning. The matter will, of course, be taken under advisement in a written decision. We'll issue in due course.